# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE BOOKS-A-MILLION, INC. ) Consolidated
STOCKHOLDERS LITIGATION ) C.A. No. 11343-VCL

## MEMORANDUM OPINION

Date Submitted: September 22, 2016
Date Decided: October 10, 2016

Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, Jeremy J. Riley, RIGRODSKY & LONG, P.A., Wilmington, Delaware; Brian C. Kerr, BROWER PIVEN, A Professional Corporation, New York, New York; *Attorneys for Plaintiffs*.

Raymond J. DiCamillo, Sarah A. Clark, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Robert L. Dell Angelo, Achyut J. Phadke, MUNGER, TOLLES & OLSON LLP, Los Angeles, California; *Attorneys for Defendants Clyde B. Anderson, Terrence C. Anderson, Family Acquisition Holdings, Inc., and Family Merger Sub, Inc.*

David E. Ross, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Blair Connelly, Blake T. Denton, LATHAM & WATKINS LLP, New York, New York; *Attorneys for Defendants Ronald G. Bruno, Terrance G. Finley, R. Todd Noden, and James F. Turner.*

William M. Lafferty, Eric Klinger-Wilensky, Kevin M. Coen, Richard Li, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; B. Warren Pope, Jerrod M. Lukacs, KING & SPALDING, Atlanta, Georgia; *Attorneys for Defendants Ronald J. Domanico and Edward W. Wilhelm.*

**LASTER, Vice Chancellor.**

In 2015, the controlling stockholders of Books-A-Million, Inc. ("BAM" or the "Company") took the Company private through a squeeze-out merger (the "Merger"). Each publicly held share of common stock was converted into the right to receive $3.25 per share, subject to the potential exercise of appraisal rights.

The plaintiffs are minority stockholders who contend that the Company's directors, its controlling stockholders, and several of its officers breached their fiduciary duties in connection with the Merger. They also contend that the transaction vehicles that the controlling stockholders used to complete the Merger aided and abetted the fiduciaries in breaching their duties. The defendants have moved to dismiss the complaint for failing to state a claim on which relief can be granted.

The Merger followed the framework approved by the Delaware Supreme Court in *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014). Consequently, unless the plaintiffs can plead facts supporting a reasonable inference that one of the elements of the framework was not met, the business judgment rule provides the operative standard of review. Under that standard of review, the court will defer to the judgments made by the corporation's fiduciaries unless the Merger is so extreme as to suggest waste.

The plaintiffs' complaint has not pled grounds to take the transaction outside of the *M&F Worldwide* framework. The business judgment rule applies. The Merger cannot be viewed as an act of waste. The complaint is therefore dismissed with prejudice.

## I. FACTUAL BACKGROUND

The relevant facts are drawn from the currently operative pleading, which is the Verified Consolidated Amended Class Action Complaint (the "Complaint"), and the

documents it incorporates by reference. The principal document that the Complaint incorporates is the definitive proxy statement filed with the Securities and Exchange Commission in connection with the Merger (the "Proxy Statement" or "Proxy"). This court may consider the Proxy Statement to establish what was disclosed to stockholders and other facts that are not subject to reasonable dispute. *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006); *Abbey v. E.W. Scripps Co.*, 1995 WL 478957, at *1 n.1 (Del. Ch. Aug. 9, 1995).

## A.     The Company

BAM is a Delaware corporation that is engaged in the retail book business. It operates over 250 bookstores, principally in the southeastern United States. BAM also sells books over the internet, engages in wholesale book sales and distribution, and has an internet development and services company. It owns a majority stake in a yogurt business, and it also develops and manages real estate through its approximately 95% stake in Preferred Growth Properties, LLC. Before the Merger, BAM's common stock traded on the NASDAQ Global Select Exchange under the ticker symbol "BAMM."

BAM was founded in 1917 by Clyde W. Anderson, and his descendants (the "Anderson Family") continue to control the Company.[1] At all times since BAM's initial

---

[1] The members of the Anderson Family include Charles C. Anderson; Hilda B. Anderson; Joel R. Anderson; Ashley Ruth Anderson; Charles C. Anderson, Jr.; Harold M. Anderson; Kayrita Anderson; Charles C. Anderson, III; Hayley Anderson Milam; Anderson BAMM Holdings, LLC; the Ashley Anderson Trust; the Lauren A. Anderson Irrevocable Trust; the Olivia Barbour 1995 Trust; the Alexandra Ruth Anderson Irrevocable Trust; the First Anderson Grandchildren's Trust FBO Charles C. Anderson, III; the First Anderson Grandchildren's Trust FBO Hayley E. Anderson; the First Anderson Grandchildren's Trust FBO Lauren A. Anderson; the Second Anderson Grandchildren's Trust FBO Alexandra R. Anderson;

public offering in 1992, the Anderson Family has controlled a majority of the Company's shares. Collectively, before the Merger, the Anderson Family controlled shares carrying approximately 57.6% of the Company's outstanding voting power. An Anderson Family vehicle also owns the minority interest in the Company's yogurt business.

At the time of the Merger, the board of directors (the "Board") had five members. Two were members of the Anderson Family: Executive Chairman Clyde B. Anderson and Terrence C. Anderson. The other three were Ronald G. Bruno, Ronald J. Domanico and Edward W. Wilhelm. The Complaint names all five directors as defendants.

Bruno joined the Board in 1992. He was formerly the chairman and CEO of a supermarket chain. At the time of the Merger, he was serving as president of an investment company and chairman of a sports marketing firm. He also had served for fourteen years on the board of Russell Corporation and for eighteen years on the board of SouthTrust Bank.

Domanico joined the Board in 2014. At the time of the Merger, he was serving as Senior Vice President of Strategic Initiatives and Capital Markets of Recall Corporation, a management services company, and as a director of NanoLumens, a private LED display designer and manufacturer. He also had served as CFO of HD Supply for several years and as CFO and director of Caraustar Industries, Inc. for seven years.

the Third Anderson Grandchildren's Trust FBO Taylor C. Anderson; the Fourth Anderson Grandchildren's Trust FBO Carson C. Anderson; the Fifth Anderson Grandchildren's Trust FBO Harold M. Anderson; the Sixth Anderson Grandchildren's Trust FBO Bentley B. Anderson; the Charles C. Anderson Family Foundation; the Joel R. Anderson Family Foundation; and the Clyde and Summer Anderson Foundation.

3

Wilhelm joined the Board in 2013. At the time of the Merger, he was serving as CFO of The Finish Line, Inc., an athletic shoe retailer. He is a certified public accountant with experience in the bookstore industry, including fifteen years as an executive and nine years as a board member with Borders Group, Inc.

None of the directors were members of management. The Company's President and CEO was defendant Terrance G. Finley. The Company's Executive Vice President and CFO was defendant R. Todd Noden. The Company's Executive Vice President of Real Estate and Business Development was defendant James F. Turner. At the time of the Merger, Finley, Noden, and Turner owned approximately 6.2% of the Company's equity. They also owned the minority stake in the Company's real estate development subsidiary. In connection with the Merger, Finley, Noden, and Turner agreed to roll over their equity in the Company in return for equity in the holding company that owns, post-Merger, 100% of the stock of the Company. The executives have maintained their management positions with the Company.

## B.     Prior Discussions About A Potential Merger

At various times during the past four years, the Anderson Family and the Company have discussed a potential business combination. In April 2012, the Anderson Family proposed to acquire the outstanding BAM shares for $3.05 per share, representing a 20% premium over BAM's closing price the previous day. The Board formed a special committee, which evaluated the proposal. The special committee concluded that the proposal undervalued the Company and asked the Anderson Family to raise their price. In July 2012, after further negotiations, the Anderson Family withdrew their proposal.

During the summer of 2013, an entity that the Proxy Statement calls "Party Y" approached BAM about a potential transaction. Party Y appears to have been a financial buyer. BAM and Party Y entered into a confidentiality agreement, and Party Y visited BAM's facilities and stores. In September, Party Y provided Clyde Anderson with an expression of interest in acquiring the Anderson Family's block for $3.30 per share in cash. Party Y indicated that it planned to cause the Company to sell its real estate holdings. Party Y also said that it might be willing to acquire all of the Company's shares. In October, Party Y confirmed its interest in potentially acquiring all of the Company's shares. The Board directed management to engage in discussions with Party Y. Clyde Anderson also participated in the discussions. According to the Proxy Statement, "[t]he Company began to question the seriousness of the discussions when Party Y did not retain an investment banking firm, and its advisors did not engage in discussions with the Company's advisors, and Party Y made no visible efforts to conduct diligence." Proxy at 15. "[O]n December 3, 2013, Clyde B. Anderson informed the Board that discussions with Party Y would be discontinued." *Id.*

In early 2014, Party Y approached BAM again. This time, Party Y proposed to acquire all of the outstanding shares of BAM for $4.15 per share. Consistent with the position it took when it first approached the Company in summer 2013, Party Y stated that did not want to retain all of the Company's business segments; Party Y only wanted the retail trade and e-commerce segments. According to the Proxy Statement, "[t]he proposal indicated that the buyer did not have sufficient capital to acquire the whole business." *Id.* The proposal was subject to the Anderson Family (i) providing a backstop

5

commitment to acquire BAM's real estate holdings for at least $19 million and (ii) buying certain other assets for approximately $2.8 million. *Id.* On April 1, 2014, the Anderson Family advised the Board that they "would not support this proposal which relied on a backstop from [them]." *Id.*

On April 16, 2014, Party Y, the Company's general counsel, and members of the Anderson Family met in person in New York, New York. After the meeting, Party Y raised its bid to $4.21 per share with the same conditions. The Anderson Family maintained that they would not support Party Y's proposal. The Proxy Statement states:

> [O]ur Board unanimously resolved to terminate discussions with Party Y given, among other things, Party Y's lack of substantial assets of its own, and its apparent inability to identify any source to finance the transaction in full, the Anderson family's unwillingness to sell their shares of the Company, Party Y's reliance on the Anderson Family committing to acquire the Company's real estate holdings for at least $19 million and the Anderson Family's unwillingness to do so.

*Id.*

## C.    The Anderson Family's Proposal

On January 29, 2015, the Board received an unsolicited proposal from the Anderson Family to acquire the outstanding shares of BAM common stock that they did not already own for $2.75 per share in a negotiated transaction. The price represented a 64% premium over BAM's closing price the day of the bid and a 65% premium over the average closing price for the past 90 trading days. The proposal anticipated that the transaction would take the form of merger between the Company and a newly formed acquisition vehicle, that management would remain in place following the merger, and

that the transaction would be financed using borrowings available under the Company's existing credit facility. Dkt. 19, Ex. D.

The proposal stated that the Anderson Family expected the Board to establish a special committee of independent directors with its own financial and legal advisors. The proposal represented that the Anderson Family "will not move forward with the transaction unless it is approved by the Special Committee." *Id.* The proposal also stated that "any definitive acquisition agreement would need to include a non-waivable majority of the minority vote condition." *Id.* The proposal stated that the Anderson Family was only interested in acquiring the shares that it did not already own and that it was not interested in selling its shares to a third party.

## D.    The Committee And Its Advisors

On January 30, 2015, the Board met to discuss the Anderson Family's proposal. The Board formed a special committee (the "Committee") to review, evaluate, and negotiate the terms of a potential transaction. The initial members of the Committee were the three directors who were not affiliated with the Anderson Family: Bruno, Domanico, and Wilhelm. The Board authorized the Committee to retain legal and financial advisors, to establish rules and procedures for the process, and to take any other actions that might be required. The Board noted that although it expected the Committee to begin work immediately, it also expected that the members of the Committee would hire their own legal counsel, who would help craft resolutions specifying the Committee's powers and mandate in greater detail.

7

After the full Board meeting, the Committee met and discussed a process for selecting a legal advisor. On February 3, 2015, after interviewing two law firms, the Committee retained King & Spalding LLP. On February 5, the Committee elected Wilhelm as chair and discussed a process for selecting a financial advisor.

On February 6, 2015, Bruno discussed with King & Spalding his "social and civic relationships with the Anderson Family." Proxy at 16. Later that day, King & Spalding met with Domanico and Wilhelm, without Bruno, to discuss the relationships. They decided it would be preferable if Bruno did not serve on the Committee. Bruno concurred and resigned that day.

On February 16, 2015, the Committee retained Morris, Nichols, Arsht & Tunnell LLP as Delaware counsel. On February 23, after vetting three firms, the Committee selected Houlihan Lokey to serve as its financial advisor. Before hiring Houlihan Lokey, the Committee considered that in 2012 and 2013, Houlihan Lokey had provided transactional advisory services to an entity affiliated with the Anderson Family and received aggregate fees of approximately $260,000.

On February 24, 2015, King & Spalding forwarded to the Company's general counsel detailed resolutions establishing the Committee's authority and mandate.

> Pursuant to those resolutions, the Special Committee was authorized to conduct the evaluation and negotiation of the potential transaction, evaluate and negotiate the terms of any proposed definitive or other documents in respect of the proposal (subject to the approval of our Board), report its recommendations and conclusions to our Board, including a determination and recommendation as to whether the proposal was fair, advisable and in the best interest of the Company and the Company's stockholders, and specifically the Company's stockholders not affiliated with the Anderson Family, investigate the Company and the proposal, review, evaluate and, if

8

necessary, negotiate other strategic options available to the Company, determine, in its sole discretion, to elect not to pursue the proposal and to retain its own independent legal and financial advisors at the Company's expense. The resolutions also authorized the Special Committee to review, evaluate and negotiate other strategic options available to the Company. In addition, the resolutions stated that the Board would not approve the proposal without a favorable recommendation from the Special Committee.

Proxy at 17. The full Board approved the resolutions by written consent.

### E. The Committee Starts Work.

Having retained its legal and financial advisors and clarified the scope of its authority and mandate, the Committee worked with its advisors to develop a strategy for evaluating the Anderson Family's proposal. Despite the Anderson Family's statements about not intending to sell any shares, the Committee decided to solicit offers for BAM from various other parties, which would enable the Committee to better assess the value of BAM and the attractiveness of the Anderson Family's offer. Particularly in light of the Anderson Family's plan to finance its proposal using the Company's existing credit facility, the Committee decided to evaluate alternative transaction structures, such as a leveraged recapitalization or special dividend.

In April 2015, Houlihan Lokey evaluated alternative structures. Houlihan Lokey also contacted three entities—Parties X, Y, and Z—that had previously expressed interest in acquiring BAM. All three initially expressed interest in a potential transaction. King & Spalding informed the Anderson Family's counsel about the existence of potential competition.

Ultimately, only Party Y submitted an indication of interest. In a letter dated April 22, 2015, Party Y proposed to acquire all of the shares of BAM for $4.21 per share,

conditioned on due diligence, financing the transaction using BAM's existing credit facility, and a no-shop provision in the definitive transaction agreement. A representative of the Anderson Family called Houlihan Lokey and reiterated that the Anderson Family was only interested in acquiring the shares it did not already own and was not interested in selling its shares.

The Committee considered Party Y's proposal and the Anderson Family's position. The Committee instructed its advisors to determine whether Party Y would consider a minority investment. Party Y indicated that it was only interested in purchasing a controlling stake in the Company.

**F.      Negotiations With The Anderson Family**

The Committee decided that its best course was to negotiate with the Anderson Family. On April 29, 2015, the Committee decided to reject the Anderson Family's proposal and counter at $3.36 per share. On May 4, in response to the Committee's counteroffer, the Anderson Family increased its offer to $3.10 per share, conditioned on a right to terminate the transaction if more than 5% of the Company's stockholders sought appraisal. On May 5, the Committee countered at $3.25 per share without any appraisal rights condition. On May 7, the Anderson Family raised its offer to $3.25 per share but with the 5% appraisal rights condition.

Negotiations briefly stalled over the inclusion of the appraisal rights condition. On May 11, 2015, the Committee decided to accept the concept of a condition, but to negotiate for a higher threshold. On May 13, the parties agreed to increase the appraisal

rights condition to 10% or more of the outstanding shares. With the key business terms resolved, counsel began preparing a transaction agreement.

On May 29, 2015, Party Y sent a letter to Houlihan Lokey reaffirming its interest in acquiring 100% of the shares of BAM for $4.21 per share, subject to the same conditions set out in its April 22 proposal. Counsel to the Committee and the Anderson Family continued negotiating the terms of the transaction agreement.

On June 30, 2015, King & Spalding advised the Committee that because the potential transaction with the Anderson Family would be financed through the use of the Company's existing credit facility, it would be prudent to obtain a solvency opinion. The Committee instructed King & Spalding to discuss the cost of an opinion with the Company's general counsel.

**G.      The Committee Approves The Merger.**

On July 13, 2015, the Committee members met in person to consider the proposed transaction. Representatives from King & Spalding advised the Committee regarding their legal duties and other matters. At that point, as a matter of efficiency, the Committee invited Bruno to listen to counsel's description of the proposed transaction and a presentation from Houlihan Lokey regarding the fairness of the transaction. Because Clyde and Terrence Anderson had recused themselves, Bruno was the only other member of the Board who would need to hear the presentations before considering whether to approve the Merger. By allowing Bruno to sit in on the presentations, the Committee members avoided needing to have the advisors go through their presentations a second

11

time, just for Bruno, if the Committee decided to recommend the Anderson Family's proposal to the Board.

King & Spalding reviewed the principal terms of the proposed transaction with the Committee and Bruno. Counsel noted that the closing of the transaction was conditioned on approval by the holders of a majority of the Company's outstanding common stock not beneficially owned by the purchaser group or the Company's Section 16 officers. Houlihan Lokey advised the Company that no one other than Party Y had submitted an alternative proposal. The Proxy Statement states:

> The Special Committee concluded that the proposal from Party Y was not viable for various reasons, including the conditions imposed and the fact that the Anderson Family would be required to sell their ownership interest in the Company under Party Y's proposal (which the Anderson Family had confirmed that they were unwilling to do).

Proxy at 23.

Houlihan Lokey then presented its financial analysis of the merger consideration. At the conclusion of its analysis, Houlihan Lokey delivered an oral opinion, subsequently confirmed in writing, that the $3.25 per share contemplated by the Anderson Family's proposal was fair to the Company's minority stockholders from a financial point of view.

At that point, Noden, the Company's CFO, joined the meeting to discuss a proposed solvency opinion from a third-party valuation firm. After his presentation, the Committee excused Noden, Bruno, and the Houlihan Lokey representatives. The Committee members then deliberated and voted to recommend the Anderson Family's offer to the full Board.

12

Later on July 13, 2015, the full Board met in person in Birmingham, Alabama to receive and consider the Committee's recommendation. Clyde and Terrence Anderson abstained from the vote. The other three directors voted in favor of the transaction, approved the merger agreement, and resolved to recommend it to the Company's stockholders.

## H.  The Stockholder Vote

The terms of the Merger were set forth in an agreement and plan of merger dated July 13, 2015 (the "Merger Agreement") between and among the Company and two acquisition vehicles formed by the Anderson Family: Family Merger Sub, Inc. ("Merger Sub") and Family Acquisition Holdings, Inc. ("Parent"). The Merger Agreement contemplated a reverse triangular merger in which Merger Sub would merge with and into the Company, the separate corporate existence of Merger Sub would cease, and the Company would survive as a subsidiary of Parent. The merger consideration of $3.25 per share valued the Company's minority interest at $21 million. The Merger was financed through borrowings under the Company's credit facilities. In connection with the Merger, the Company's three top executives (Finley, Nolen, and Turner) entered into roll-over agreements in which they committed to contribute their BAM common stock to Parent in return for an equity interest in Parent. The members of the Anderson Family entered into a voting agreement in which they committed to voting all of their common stock in favor of the Merger. Clyde and Terrence Anderson executed the voting agreement on behalf of the members of the Anderson Family.

On August 21, 2015, BAM filed a 93-page preliminary proxy statement with the SEC. On August 27, 2015, the Company obtained a solvency opinion from Cappello Group, Inc. On October 22, BAM filed its definitive proxy statement, followed by a revised version on October 23.

The Merger Agreement was submitted to the Company's stockholders at a meeting held on December 8, 2015. Holders of approximately 66.3% of the shares who were not affiliated with the Anderson Family or any Section 16 officer of the Company approved the Merger. The transaction closed on December 10.

## I.      This Litigation

A stockholder plaintiff filed suit in July 2015 and another in October. The same law firms represented both plaintiffs. In February 2016, the cases were consolidated. After the defendants moved to dismiss the consolidated complaint and filed their opening briefs, the plaintiffs elected to amend their complaint, resulting in the currently operative pleading. The defendants renewed their motions to dismiss.

## II.      LEGAL ANALYSIS

The defendants have moved to dismiss the complaint for failing to state a claim on which relief can be granted. *See* Ct. Ch. R. 12(b)(6). When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

The Complaint names eight individuals and two entities as defendants. The individual defendants are (i) Domanico and Wilhelm, as the two members of the Committee who negotiated and recommended the Merger, (ii) Bruno, as a director who voted with Domanico and Wilhelm to approve the Merger, (iii) Clyde Anderson and Terrence Anderson, as the representatives of the Anderson Family, and (iv) Finley, Noden, and Turner, as members of management. The two entity defendants are the two acquisition vehicles, Parent and Merger Sub.

The Complaint contains three counts. Count I asserts that all of the individual defendants breached their fiduciary duties in connection with the Merger. Count I primarily focuses on the members of the Committee, but it also alleges that Bruno tainted the Committee's process and contends that all three directors breached their duties by voting in favor of the Merger at the Board level. Count I also alleges that the three executives breached their duties by rolling over their shares as part of the Merger. It further contends that Clyde and Terrence Anderson somehow breached their duties as directors, even though they did not participate in the process as directors and recused themselves from the vote. Count II separately contends that the Andersons breached their fiduciary duties under the more comprehensible theory that they did so as controlling stockholders. Compl. ¶ 114. Count III alleges that the acquisition vehicles aided and abetted the individual defendants in breaching their duties.

15

In this case, it is not necessary to parse finely among the defendants and counts. The plaintiffs' core contention is that the fiduciaries involved in the Merger breached their duties. The members of the Anderson Family, embodied by Clyde and Terrence Anderson, breached their fiduciary duties as the Company's controlling stockholders by proposing, negotiating, and engaging in the Merger. The committee members breached their fiduciary duties by negotiating the Merger and recommending it to the Board. And the members of the Board who followed the Committee's recommendation breached their fiduciary duties by approving the Merger and recommending it to the stockholders. If that central theory fails to state a claim, then the members of management cannot have breached their fiduciary duties by rolling over their shares as part of a transaction untainted by any other breach. Likewise, if there is no underlying breach of duty, then the acquisition vehicles cannot have aided and abetted anything.

Whether the plaintiffs' core contention states a claim for breach of fiduciary duty depends on the applicable standard of review. Ordinarily, when a controlling stockholder takes a company private, the operative standard of review is the entire fairness test. *See Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997). In *M&F Worldwide*, the Delaware Supreme Court held that the business judgment rule would provide the operative standard of review if the controller satisfied the following six elements:

> (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitely; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.

16

88 A.3d at 645. When the business judgment rule provides the operative standard of review, then a court will not consider the substance of the transaction unless its terms are so extreme as to constitute waste and thereby support an inference of subjective bad faith. *See In re MFW S'holders Litig.*, 67 A.3d 496, 519 & nn.107 & 109 (Del. Ch. 2013) (Strine, C.), *aff'd sub nom. M&F Worldwide*, 88 A.3d 635 (Del. 2014).

Compliance with the *M&F Worldwide* structure can be tested on a motion to dismiss.[2] If the defendants have described their adherence to the elements identified in *M&F Worldwide* "in a public way suitable for judicial notice, such as board resolutions and a proxy statement," then the court will apply the business judgment rule at the motion to dismiss stage unless the plaintiff has "pled facts sufficient to call into question the existence of those elements." *Swomley*, 2014 WL 4470947, at *20.

In this case, the allegations of the Complaint do not support a reasonably conceivable inference that any of the *M&F Worldwide* conditions were not met. The business judgment rule therefore applies. The Complaint also does not support a reasonably conceivable inference that the Merger constituted waste. Consequently, the defendants' motion is granted.

---

[2] *Swomley v. Schlecht*, 2014 WL 4470947, at *20 (Del. Ch. Aug. 27, 2014) (TRANSCRIPT), *aff'd*, 128 A.3d 992 (Del. 2015) (TABLE); *see MFW*, 67 A.3d at 504 (explaining that one purpose of the *M&F Worldwide* structure was to remedy a doctrinal situation in which there was "no feasible way for defendants to get [cases] dismissed on the pleadings"); *see also In re Cox Commcn's, Inc. S'holders Litig.*, 879 A.2d 604, 618, 628, 633, 644, 647 (Del. Ch. 2005) (proposing the framework eventually adopted in *M&F Worldwide* and noting problems with the then-existing regime under which defendants lacked a meaningful chance of prevailing on a motion to dismiss).

## A.    The Dual Upfront Conditions

The first requirement of *M&F Worldwide* is that the controller condition the transaction "*ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders." 88 A.3d at 644.

The offer letter dated January 29, 2015, that the Anderson Family sent to the Company conditioned any transaction, from the outset, on approval by both a special committee of independent directors and a non-waivable vote of disinterested stockholders. The operative text in the Anderson Family's offer letter was substantively identical to what was held to be sufficient in *M&F Worldwide*. *See MFW*, 67 A.3d at 506. The Complaint does not allege that the Anderson Family delayed establishing the conditions, wavered from them, or sought to circumvent them.

The plaintiffs' sole argument on the first element is that the 2015 proposal was a continuation of the Anderson Family's 2012 proposal, which did not have the twin conditions necessary for the *M&F Worldwide* framework. That is not a reasonably conceivable inference. The Complaint recognizes that a special committee rejected the 2012 offer, thereby terminating it. *See, e.g.*, ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 3.41 (Matthew Bender 2016) (explaining that "a definite rejection terminates the offeree's power to accept"). The 2015 offer came nearly three years after the 2012 offer and contained a different price and different terms. The 2015 proposal was a different offer, and it generated a separate process. The first requirement for the *M&F Worldwide* framework is therefore satisfied.

18

## B.      The Committee's Independence

The second requirement under *M&F Worldwide* is that the members of the special committee are disinterested and independent. 88 A.3d at 645. To plead that a director is interested in a manner sufficient to challenge the *M&F Worldwide* framework, a plaintiff must allege facts supporting a reasonably conceivable inference that the director received "a personal financial benefit from a transaction that is not equally shared by the stockholders."[3] To plead that a director is not independent in a manner sufficient to challenge the *M&F Worldwide* framework, a plaintiff must allege facts supporting a reasonable inference that a director is sufficiently loyal to, beholden to, or otherwise

---

[3] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (citations omitted); *accord Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally.") (footnotes omitted); *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("Directorial interest exists whenever . . . a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders.") (footnote omitted). "[A] subjective 'actual person' standard [is used] to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995)). "[T]he benefit received by the director and not shared with stockholders must be 'of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest.'" *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)).

In *Brehm v. Eisner*, the Delaware Supreme Court overruled seven precedents, including *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) and *Pogostin*, to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. 746 A.2d 244, 253 n.13 (Del. 2000),. The *Brehm* court held that, going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253. This decision does not rely on *Aronson* or *Pogostin* for the standard of appellate review and therefore omits the cumbersome subsequent history.

influenced by an interested party so as to undermine the director's ability to judge the matter on its merits.[4]

The plaintiffs do not directly challenge the independence or disinterestedness of Wilhelm or Domanico, who were the two individuals who served on the Committee, negotiated with the Anderson Family, and decided to recommend the Anderson Family's offer to the Board. The Complaint does not allege, for example, that Wilhelm or Domanico are related to the Anderson Family. They each held a 0.2% interest in BAM

---

[4] *Aronson*, 473 A.2d at 815 (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person"); *accord Friedman v. Beningson*, 1995 WL 716762, at *4 (Del. Ch. Dec. 4, 1995) (Allen, C.) ("The requirement that directors exercise *independent judgment,* (*insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment*), directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation."). A classic example is a close familial relationship. *See, e.g.*, *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) ("That Hudson also happens to be Huizenga's brother-in-law makes me incredulous about Hudson's impartiality. Close familial relationships between directors can create a reasonable doubt as to impartiality. The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable.") (footnote omitted); *Chaffin v. GNI Gp., Inc.*, 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999) (holding that a father-son relationship was sufficient to rebut the presumption of independence: "Inherent in the parental relationship is the parent's natural desire to help his or her child succeed. . . . [M]ost parents would find it highly difficult, if not impossible, to maintain a completely neutral, disinterested position on an issue, where his or her own child would benefit substantially if the parent decides the issue a certain way"); *see also London v. Tyrrell*, 2010 WL 877528, at *14 n.60 (Del. Ch. Mar. 11, 2010) ("[I]n the pre-suit demand context, plaintiffs can often meet their burden of establishing a lack of independence with a simple allegation of a familial relationship. Surely then . . . it will be nigh unto impossible for a corporation bearing the burden of proof to demonstrate that an SLC member is independent in the face of plaintiffs' allegation that the SLC member and a director defendant have a family relationship.").

common stock at the time of the Merger, but their stock was not treated any differently than the minority shares. Although the Complaint notes in a footnote that each member of the Committee "receive[d] $35,000 in cash" for serving, the payment was not contingent on the success of the Merger. Compl. ¶ 62 n.2; Proxy at 53. *See Swomley,* 2014 WL 4470947, at *21 (holding that receipt of a non-contingent fee by a special committee member does not render that committee member interested or not independent).

Instead, the plaintiffs raise two collateral attacks on the independence and disinterestedness of the Committee: (i) they allege that Bruno, who purportedly was not independent, tainted the independence of the Committee by sitting in on Houlihan Lokey's fairness opinion presentation; and (ii) they allege that Wilhelm and Domanico approved the Merger in bad faith, thereby displaying a lack of independence in fact.

In challenging the independence of Bruno, the plaintiffs point to language in the Proxy disclosing that Bruno resigned from the Committee after identifying his "social and civic relationships with the Anderson Family." Precisely because Bruno resigned from the Committee at an early stage, this decision need not determine whether the Complaint supports a reasonably conceivable inference that Bruno could not be independent. He only served on the Committee for a matter of days, and he did not participate in the negotiation of the Merger. He voluntarily resigned after receiving feedback from his fellow Committee members that it would be preferable if he did not serve. That was a commendable step for Bruno and the Committee to take. The same thing happened in *MFW*, where a director initially was appointed to the special committee because he was independent under the rules of the New York Stock Exchange,

21

but resigned shortly thereafter when it was determined that he had "some current relationships that could raise questions about his independence for purposes of serving on the special committee." 67 A.3d at 507. Just as a prompt resignation did not undermine the effectiveness of the *M&F Worldwide* framework in the seminal case, it does not undermine the Committee's independence here.

The plaintiffs argue that Bruno tainted the Committee's independence by sitting in on Houlihan Lokey's fairness presentation after the negotiations were completed. Clyde and Terrence Anderson had recused themselves from the sale process because of their role on the buy side, leaving Wilhelm, Domanico, and Bruno to comprise the quorum necessary for transactional approval. As a member of the Board who ultimately would vote on the Merger, Bruno needed to hear the fairness presentation.

To create a truly pristine process, Houlihan Lokey could have given its presentation twice: once to Wilhelm and Domanico as members of the Committee, then, if they recommended the transaction, a second time to Wilhelm, Domanico, and Bruno as members of the Board. The directors decided to avoid the need for a repeat performance by having Bruno sit in when Houlihan Lokey made its presentation to the Committee. After hearing the presentation, Bruno was excused, as was Houlihan Lokey and Noden, the Company's CFO. Wilhelm and Domanico then deliberated and voted to accept the Anderson Family's offer. Under different circumstances, the participation of a director whose independence was compromised might be problematic. But in this case, the allegations of the Complaint do not support a reasonably conceivable inference that having Bruno present solely for Houlihan Lokey's fairness presentation prevents the

22

Merger from meeting this element of the *M&F Worldwide* test.

The plaintiffs' second argument regarding Wilhelm and Domanico's independence and disinterestedness goes to the core of their case. The plaintiffs contend that even if Wilhelm and Domanico appeared to be independent, disinterested, and uninfluenced by Bruno's purportedly tainting presence, that appearance is belied by their bad faith actions. The plaintiffs allege that by recommending the Anderson Family's offer, Wilhelm and Domanico elevated the interests of the Anderson Family over those of the minority stockholders, so they must have lacked independence in fact.

It is not immediately clear how an argument regarding bad faith fits within the *M&F Worldwide* framework. The Delaware Supreme Court did not discuss whether a plaintiff could seek to call into question the independence of a director by contending that although appearing independent, the director did not in fact act independently for the benefit of the stockholders but rather in pursuit of some other interest, such as to benefit the controlling stockholder. The trial court opinion did not devote significant attention to the issue, but it did state, after concluding that the committee in that case had met its duty of care, that "[b]ecause the special committee was comprised entirely of independent directors, there is no basis to infer that they did not attempt in good faith to obtain the most favorable price they could secure for the minority or believe they had done so." *MFW*, 67 A.3d at 516.

In light of this comment, it seems that the difficult route of pleading subjective bad faith is theoretically viable means of attacking the *M&F Worldwide* framework. This makes sense, because pleading facts sufficient to support an inference of subjective bad

23

faith is one of the traditional ways that a plaintiff can establish disloyalty sufficient to rebut the business judgment rule.[5] "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (citations omitted). "[T]he requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (internal quotation marks and citations omitted). Subjective bad faith can take the form of "an intent to harm" or an "intentional dereliction of duty."[6] "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other

---

[5] *See In re Walt Disney Co. Derivative Litig. (Disney II)*, 906 A.2d 27, 53 (Del. 2006). ("Our law clearly permits a judicial assessment of director good faith for that former purpose [of rebutting the business judgment rule]."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010) ("Under Delaware law, when a plaintiff demonstrates the directors made a challenged decision in bad faith, the plaintiff rebuts the business judgment rule presumption, and the burden shifts to the directors to prove that the decision was entirely fair to the corporation and its stockholders."); *In re Walt Disney Co. Derivative Litig.* (*Disney I*), 907 A.2d 693, 760–79 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (conducting a director-by-director analysis to determine if the individual members of the board, none of whom were directly interested in the hiring or termination of the corporation's President, acted in bad faith).

[6] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009); *accord Disney II*, 906 A.2d at 64–66 (defining "subjective bad faith" as "conduct motivated by an actual intent to do harm," which "constitutes classic, quintessential bad faith," and "intentional dereliction of duty" as "a conscious disregard for one's responsibilities"); *see also Stone*, 911 A.2d at 370 (holding, in the context of an oversight claim, that "utter[] fail[ure] to implement any reporting or information system or controls" or, "having implemented such a system or controls, conscious[] fail[ure] to monitor or oversee its operations" demonstrated "a conscious disregard" for directors' fiduciary responsibilities).

than that of advancing the best interests of the corporation."[7] "It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[8] Bad faith can be the result of "any human emotion [that] may cause a director to place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[9]

In this case, the centerpiece of the plaintiffs' argument that the independent directors acted in bad faith is Party Y's offer, which the Complaint describes as a "substantially superior offer—$0.96 more per share, or nearly 30% higher than the Anderson Family's offer." Compl. ¶ 4. The Complaint contends that it is not rational for a director to take a lower priced offer when a comparable, higher priced offer is available. Because no one rationally would do that, the plaintiffs contend that the independent

---

[7] *Disney II*, 906 A.2d at 67 (quoting *Disney I*, 907 A.2d at 755); *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . .") (quoting *Disney II*, 906 A.2d at 67); *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law") (emphasis omitted); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[8] *Disney I*, 907 A.2d at 754; *see Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) ("[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.").

[9] *RJR Nabisco*, 1989 WL 7036, at *15; *see Guttman v. Huang*, 823 A.2d at 506 n.34 ("The reason for the disloyalty (the faithlessness) is irrelevant, [and] the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

25

directors must have had some ulterior motive for not pursuing Party Y's offer. As the plaintiffs see it, the failure to pursue Party Y's offer supports an inference that the independent directors disloyally favored the interests of the Anderson Family. Although they may have been independent in appearance, the plaintiffs seek an inference that they were not independent in fact.

Chancellor Allen addressed the duties of directors under comparable circumstances in *Mendel v. Carroll*, 651 A.3d 297 (Del. Ch. 1994). The case arose out of a proposal by members of the Carroll family, who were the controlling stockholders of Katy Industries, Inc. ("Katy"), to acquire all of Katy's unaffiliated shares for $22 each. The family informed the board that they only were interested in buying and had no interest in selling any of their shares. The board appointed a special committee, which negotiated with the family and eventually agreed to a transaction at $25.75 per share.

After the special committee had reached its deal with the Carroll family, an acquisition vehicle sponsored by Pensler Capital Corporation proposed to purchase all of Katy's outstanding shares for at least $29 per share. The higher price led the special committee to determine that it could no longer endorse the merger with the Carroll family. After changing its investment partner, Pensler reduced its offer to $28, then to $27.80.

With the special committee having withdrawn its recommendation, the Carroll family exercised its right to terminate its merger agreement with Katy. Over the Carroll family's objection, the board authorized the special committee to negotiate with Pensler. To get around the Carroll family's refusal to sell, Pensler proposed that Katy issue it an

option to purchase a number of Katy shares at the transaction price which, if exercised, would be sufficient to dilute the Carroll family's ownership to approximately 40%. Not surprisingly, the Carroll family strongly objected to that course of action, contending that it would constitute a breach of fiduciary duty. The special committee was willing to pursue the idea, as long as Delaware counsel could opine that the option was legal. When the committee's Delaware counsel could not render a definitive opinion, the Pensler deal fell apart, and the committee discontinued the negotiations. The board resolved instead to declare a special dividend of $14 per share.

A stockholder plaintiff sought a mandatory injunction requiring the Katy board to issue the dilutive option to facilitate the Pensler transaction. Citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), the plaintiff argued that the board had breached its fiduciary duties by not issuing the dilutive option because the Pensler deal constituted the best transaction reasonably available for the minority stockholders. Chancellor Allen held that *Revlon* did not apply, but he agreed that the "obligation the board faces is rather similar" to "the obligation that the board assumes when it bears what have been called 'Revlon duties.'" *Mendel*, 651 A.3d at 306. This was because

> *if* the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the time frame for analysis, insofar as those shareholders are concerned, is immediate value maximization. The directors are obliged in such a situation to try, within their fiduciary obligation, to maximize the current value of the minority shares.

*Id.* (emphasis in original).

The critical issues were how far directors could go "within their fiduciary obligation" to maximize the value of the minority shares and whether their powers included the ability to facilitate a third-party transaction by diluting an existing control block. Chancellor Allen did not rule out the power of a board to dilute a majority holder. As he had in three prior decisions, Chancellor Allen explained that incumbent directors could not dilute an existing block of stock for the purpose of maintaining their control, but they could permissibly dilute a dominant block if the directors acted "in good faith and on the reasonable belief that a controlling shareholder is abusing its power and is exploiting or threatening to exploit the vulnerability of minority shareholders."[10] Under this rubric, if the Carroll family's refusal to sell their shares could be considered an abuse of power or exploitation of the minority, then Katy's board could have authorized the dilutive option and a court would have the ability, on an appropriate factual record, to issue mandatory injunctive relief.

Chancellor Allen concluded that the Carroll family's proposal and its refusal to support the Pensler offer did not present the type of "threat of exploitation or even unfairness towards a vulnerable minority that might arguably justify discrimination against a controlling block." *Mendel*, 651 A.2d at 304. He began by explaining why the

_____

[10] *Id.* at 304. The earlier cases in which Chancellor Allen had expressed similar views were *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 662 n.5 (Del. Ch. 1988), *Freedman v. Rest. Assocs. Indus., Inc.*, 1987 WL 14323, at *8 (Del. Ch. Oct. 16, 1987); and *Philips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *8 (Del. Ch. Aug. 27, 1987). Chancellor Allen drew support for the underlying premise that a board could deploy corporate power to address a threat posed by an existing stockholder from *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985).

two offers were not directly comparable, such that the Carroll family's refusal to support the numerically higher Pensler offer could not by itself give rise to an inference of exploitation or unfairness:

> Plaintiffs see in the Carroll Group's unwillingness to sell at $27.80 or to buy at that price, a denial of plaintiffs' ability to realize such a price, and see this as exploitation or breach of duty. This view implicitly regards the $27.80 per share price and the Carroll Family Merger price of $25.75 as comparable sorts of things. But they are legally and financially quite different. *It is, for example, quite possible that the Carroll $25.75 price may have been fair, even generous, while the $27.80 Pensler price may be inadequate.* If one understands why this is so, one will understand one reason why the injunction now sought cannot be granted.
>
> The fundamental difference between these two possible transactions arises from the fact that the Carroll Family already in fact had a committed block of controlling stock. Financial markets in widely traded corporate stock accord a premium to a block of stock that can assure corporate control. Analysts differ as to the source of any such premium but not on its existence. Optimists see the control premium as a reflection of the efficiency enhancing changes that the buyer of control is planning on making to the organization. Others tend to see it, at least sometimes, as the price that a prospective wrongdoer is willing to pay in order to put himself in the position to exploit vulnerable others, or simply as a function of a downward sloping demand curve demonstrating investors' heterogeneous beliefs about the subject stock's value. In all events, it is widely understood that buyers of corporate control will be required to pay a premium above the market price for the company's traded securities.
>
> The law has acknowledged, albeit in a guarded and complex way, the legitimacy of the acceptance by controlling shareholders of a control premium.
>
> The significant fact is that in the Carroll Family Merger, the buyers were not buying corporate control. With either 48% or 52% of the outstanding stock they already had it. Therefore, in evaluating the fairness of the Carroll proposal, the Special Committee and its financial advisors were in a distinctly different position than would be a seller in a transaction in which corporate control was to pass.
>
> The Pensler offer, of course, was fundamentally different. It was an offer, in effect, to the controlling shareholder to purchase corporate control, and

29

to all public shareholders, to purchase the remaining part of the company's shares, all at a single price. It distributed the control premium evenly over all shares. Because the Pensler proposed $27.80 price was a price that contemplated not simply the purchase of non-controlling stock, as did the Carroll Family Merger, but complete control over the corporation, it was not fairly comparable to the per-share price proposed by the Carroll Group.

*Id.* at 304–05 (citations omitted).

The fact that the offers were fundamentally different, however, did not end the analysis. As Chancellor Allen explained, "[t]o note that these proposals are fundamentally different does not, of course, mean that the board owes fiduciary duties in one instance but not the other." *Id.* at 305. Instead, the directors were "obligated to take note of the circumstance that the proposal was being advanced by a group of shareholders that constituted approximately 50% of all share ownership," and that in that circumstance, "the board's duty was to respect the rights of the Carroll Family, while assuring that if any transaction of the type proposed was to be accomplished, it would be accomplished only on terms that were fair to the public stockholders and represented the best available terms from their point of view." *Id.* The rights of the Carroll family included the right not to have to sell their shares.[11]

---

[11] *Mendel*, 651 A.2d at 306 ("No part of their fiduciary duty as controlling shareholders requires them to sell their interest."); *accord Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 844–45 (Del. 1987); *MFW*, 67 A.3d at 508; *see Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) (Allen, C.) ("While the law requires that corporate fiduciaries observe high standards of fidelity and, when self-dealing is involved, places upon them the burden of demonstrating the intrinsic fairness of transactions they authorize, the law does not require more than fairness. Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders."); *see also In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271, at *8 (Del. Ch. Oct. 21, 1988) ("[A] controlling shareholder who bears fiduciary obligations . . . also has rights that may not be ignored . . . includ[ing] a right to

> The board's fiduciary obligation to the corporation and its shareholders, in this setting, requires it to be a protective guardian of the rightful interest of the public shareholders. But while that obligation may authorize the board to take extraordinary steps to protect the minority from plain overreaching, it does not authorize the board to deploy corporate power *against* the majority stockholders, in the absence of a threatened serious breach of fiduciary duty by the controlling stock.

*Mendel*, 651 A.2d at 306. Chancellor Allen found no indication that the $25.75 price that the Carroll family proposed to pay was an inadequate or unfair price for the non-controlling stock, or that the Carroll family had abused its control by proposing the transaction or refusing to sell.

Applied to this case, *Mendel*'s teachings defeat any reasonably conceivable inference of bad faith. Like the Carroll family in *Mendel*, the Anderson Family did not breach its duties by refusing to sell its shares to Party Y. Also like the Carroll family, the Anderson Family did not breach any duty to the corporation or its minority, nor did it overreach or threaten exploitation, by proposing a going-private transaction at a substantial premium to the market price. Since *Mendel*, the Delaware Supreme Court has approved the *M&F Worldwide* framework as a means of implementing a non-coercive, arms' length process for negotiating a squeeze-out. The Anderson Family followed the *M&F Worldwide* framework and conditioned its proposal on both an affirmative recommendation by an independent committee and the affirmative vote of a majority of the Company's unaffiliated shares. The Anderson Family thus ensured up front that the

---

effectuate a [squeeze-out] so long as the terms are intrinsically fair to the minority considering all relevant circumstances . . . .").

Company's minority stockholders would be able to determine for themselves whether to accept any offer that the committee recommended. Having followed *M&F Worldwide*, the members of the Anderson Family have an even stronger argument than the Carroll family that they did not overreach or exploit the minority by making their proposal.

Under the rule of law articulated in *Mendel*, the Committee could not have acted loyally by deploying corporate power *against* the Anderson Family to facilitate a third-party deal. The Committee could explore third-party offers to test whether the members of the Anderson Family would stick to their buyer-only stance when presented with an opportunity to sell. The Committee also could use a third-party offer to assess the value of the Company and determine whether the Anderson Family's bid was so low as to warrant rejecting it outright without presenting it to the minority. This is what the Committee did. Rather than supporting an inference of bad faith, the Committee's actions support an inference of good faith.

To defeat the logic of *Mendel*, the plaintiffs have argued that it cannot be assumed that Party Y's offer incorporated a control premium and that the Proxy Statement does not support such an inference. To the contrary Delaware law recognizes that third party offers typically include a control premium[12] and that that minority shares conversely

---

[12] *See, e.g., Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1994) ("The acquisition of majority status and the consequent privilege of exerting the powers of majority ownership come at a price. That price is usually a control premium . . . ."); *Cheff v. Mathes*, 199 A.2d 548, 555 (Del. 1964) ("[I]t is elementary that a holder of a substantial number of shares would expect to receive the control premium as part of his selling price . . . ."); *In re Marriott Hotel Props. II Ltd. P'ship Unitholders Litig.*, 1996 WL 342040, at *4 (Del. Ch. June

trade at a discount when a dominant or controlling stockholder is present.[13] Scholars have

documented the same propositions[14] with the premiums and discounts varying across

12, 1996) ("[T]he right to direct the management of the firm's assets . . . gives rise to the phenomena of control premia.").

[13] *See, e.g.*, *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 912 (Del. Ch. 1999) ("[B]ecause the market ascribed a control premium to the publicly-held majority ownership, it similarly ascribed a minority share discount to the publicly-traded shares . . . ."); *Robotti & Co., LLC v. Gulfport Energy Co.*, 2007 WL 2019796, at *2 (Del. Ch. July 3, 2007) ("References to trading price may not be especially useful . . . in this instance, because the trading . . . was limited and [the company] had a control shareholder."); *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *8 (Del. Ch. Aug. 19, 2005) (Strine, V.C.) (pointing out that in the appraisal context, "the fair value standard itself is, in many respects, a pro-petitioner standard that takes into account that many transactions giving rise to appraisal involve mergers effected by controlling stockholders. The elimination of minority discounts, for example, represents a deviation from the fair market value of minority shares as a real world matter in order to give the minority a pro rata share of the entire firm's value—their proportionate share of the company valued as a going concern."); *Klang v. Smith's Food & Drug Ctrs., Inc.*, 1997 WL 257463, at *11 (Del. Ch. May 13, 1997) (recognizing that "factors that tend to minimize or discount [a] premium [include] the fact that the . . . stock price contain[s] a minority trading discount as a result of [a party's] control" of a company); *MacLane Gas Co. Ltd., Partnership v. Enserch Corp.*, 1992 368614, at *9 (Del. Ch. Dec. 9, 1992) (finding that the "the stock price . . . was not a reliable indication of the value of the [shares of the company at issue because] . . . the trading price contained an implicit minority discount as a result of [the defendant's] control over [the company]"); *see also Goemaat v. Goemaat*, 1993 WL 339306, at *6 (Del. Fam. May 19, 1993) (applying a minority discount to wife's 11% ownership in a private family business in a divorce proceeding because wife's sister controlled and owned 60% of the business).

[14] *Compare* John C. Coates IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. PA. L. REV. 1251, 1273–74 (1999) ("Whether measured against very small blocks that trade on the public stock markets daily or against larger but noncontrol share blocks, control shares command premium prices."), *with* James H. Eggart, *Replacing the Sword with A Scalpel: The Case for A Bright-Line Rule Disallowing the Application of Lack of Marketability Discounts in Shareholder Oppression Cases*, 44 ARIZ. L. REV. 213, 220 (2002) ("A minority discount accounts for the fact that a minority interest, because it lacks the power to dictate corporate management and policies, is worth less to third-party purchasers than a controlling interest."). *See also* Matthew D. Cain, Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *How Corporate Governance is Made: The Case of the Golden Leash*, 164 U. PA. L. REV. 649, 657 (2016) ("[P]ublically traded shares of firms with a controlling shareholder trade at a so-called 'minority discount.' Because minority shares in a controlled corporation lack the ability to influence the management of the firm, they trade at a discount relative to other shares.") (citations omitted); Ronald J. Gilson & Jeffrey N.

legal systems depending on the extent of the protections that a particular legal system provides to minority stockholders.[15]

On the facts alleged, one can reasonably infer that Party Y's offer was higher because Party Y was seeking to acquire control and that the Anderson Family's offer was lower because it took into account the family's existing control over the Company. It is not possible to infer the exact amount of the premium or discount, because although it is reasonable to regard Party Y's offer as an arms' length price for the Company as a whole, the premium that the Anderson Family offered over the market price may have included some sharing of the value otherwise attributable to the Anderson Family's block. Using the two offers as guideposts, Party Y's offer of $4.21 per share for the whole company represented a premium of $0.96 per share, or approximate 30%, over the Anderson Family's offer of $3.25 per share for the minority. Put another way, the Anderson Family's offer of $3.25 per share for the minority shares contemplated a discount of

---

Gordon, *Controlling Controlling Shareholders*, 152 U. PA. L. REV. 785, 787 (2003) ("[T]he controlling shareholder secures value from its control position that is not received by the non-controlling shareholders. In turn, the controlling shareholder can extract the same value from control by selling it at a premium to the value of the non-controlling shares.").

[15] *See,* e.g., Alexander Dyck & Luigi Zingales, *Control Premiums and the Effectiveness of Corporate Governance Systems*, 16 J. APPLIED CORP. FIN. 51 (2004); Alexander Dyck & Luigi Zingales, *Private Benefits of Control: An International Comparison* (Nat'l Bureau of Econ. Research, Working Paper No. 8711, 2002). Rafael La Porta, *et al.*, *Investor Protection and Corporate Governance* 14 & n.4 (July 27, 2000), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=183908; Luigi Zingales, *The Value of the Voting Right: A Study of the Milan Stock Exchange Experience*, 7 REV. FIN. STUD. (1994); Michael J. Barclay & Clifford G. Holderness, *Private Benefits from Control of Public Corporations*, 25 J. FIN. ECON. 371 (1989). Other factors can affect control premiums, including "an independent and widely circulating press, high rates of tax compliance, and a high degree of product market competition." Dyck & Zingales, *Control Premiums*, *supra*, at 53.

approximately 23% from the $4.21 that Party Y, a third-party purchaser, would pay for the Company as a whole.

If the independent directors facilitated a grossly inadequate offer, then it might be possible to infer that they acted in bad faith. If the amount of the minority discount was extreme, then one might infer that the independent directors sought to serve the interests of the controller, confident that stockholders focused on short-term gains would approve any transaction at a premium to market. This is not such a case, because the bargained-for consideration falls within a rational range of discounts and premiums.[16] In other words, the difference is not so facially large as to suggest that the Committee was attempting to

---

[16] *See, e.g., Wilmington Sav. Fund Soc'y, FSB v. Foresight Energy LLC*, 2015 WL 7889552, at *9 n.3 (Del. Ch. Dec. 4, 2015) ("[A] number of studies have found that control premia in mergers and acquisitions typically range between 30% and 50%.") (citing FACTSET MERGERSTAT, CONTROL PREMIUM STUDY 1ST QUARTER 2012, at 2 (2012); Jens Kengelbach & Alexander Roos, The Boston Consulting Group, *Riding the Next Wave in M & A: Where Are the Opportunities to Create Value?* 10 (2011)); *In re Southern Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 819 (Del. Ch. 2011) (applying a "conservative" control premium of 23.4%, which was the "median premium for merger transactions in 2004 calculated by Mergerstat"); *Prescott Gp. Small Cap, L.P. v. Coleman Co.*, 2004 WL 2059515, at *13 n.77, *28 (Del. Ch. Sept. 8, 2004) (accepting as "consistent with Delaware law" a control premium valuation range of "30 to 40 percent"); *Agranoff v. Miller*, 791 A.2d 880, 900 (Del. Ch. 2001) (applying a 30% discount to a comparable companies analysis to adjust for an implicit minority discount, noting that the discount in the relevant market sector "tended to be lower on average than that for the entire marketplace"); *Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *5 (Del.Ch. June 15, 1995) (citing available premium data ranging from 34%–48%); *see also* Coates, *supra* note 13, at 1274 n.72 (citing data for the period from 1981 through 1994, indicating that "prices paid in acquisitions by negotiated purchase or tender offer of control shares in public companies exceeded the market prices for the targets' outstanding stock by an average of approximately 38%" and that during the same period, "average prices paid in the same types of acquisitions of large (>10%) but noncontrolling blocks of shares in public companies also exceeded market prices for the targets' outstanding stock, but premiums for these noncontrol share blocks averaged only 34.5%"); Gary Fodor & Edward Mazza, *Business Valuation Fundamentals for Planners*, 5 J. FIN. PLAN. 170, 177 (1992) (stating that control premiums paid for public companies averaged 30% to 40% from the late 1960s to the late 1980s).

facilitate a sweetheart deal for the Anderson Family. The Committee instead was entitled to consider the fact that the minority stockholders would be able to determine for themselves whether to accept the Anderson Family's offer. When deciding on a course of action, a board can "take into account that its stockholders would have a fair chance to evaluate the board's decision for themselves." *C&J Energy Servs., Inc. v. City of Miami Gen. Empls.' Ret. Tr.*, 107 A.3d 1049, 1070 (Del. 2014).

Appraisal acts as a further check on expropriation by the Anderson Family, because when valuing the BAM shares in an appraisal proceeding, a court would exclude any minority discount.[17] That is why the Anderson Family insisted on an appraisal condition and why the deal almost broke down over that issue. The Committee rationally could have believed that if stockholders felt aggrieved over a price that implied a minority discount, they could protect themselves by pursuing appraisal, and that if enough stockholders exercised their appraisal rights, then the Anderson Family might rely on the appraisal condition to back out of the deal. A minority of the minority thus had the ability to influence the outcome of the transaction, although they lacked an explicit veto right.

---

[17] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989) ("The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a 'going concern.'"); *see Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 557 (Del. 2000) ("[T]here can be no discounting at the shareholder level."); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 804 (Del. 1992) ("[A] court cannot adjust its valuation to reflect a shareholder's individual interest in the enterprise."). *See generally* Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers & Consolidations*, 38–5th C.P.S. § V(I), at A-65 (BNA) ("Delaware law precludes the application of a minority discount in an appraisal proceeding at the stockholder level.").

There are other indications in the record that foreclose an inference of bad faith on the part of the independent directors. To draw that inference, it would be necessary to believe that the only rational course of action for the Committee was to reject the Anderson Family's offer and not allow it to be presented to the stockholders. But the $3.25 per share that was offered by the Anderson Family was 93% higher than the trading price the day before the Anderson Family first proposed a merger, 23% higher than the trading price the day before the Merger was announced, and 20% higher than the Anderson Family's initial offer of $2.75, which the Committee rejected. The Committee rationally could believe that stockholders might prefer liquidity at a premium to market. In addition to explaining this rationale, the Proxy Statement identifies nine other bulleted reasons, some with sub-bullets, why the Committee viewed the Merger favorably and recommended it to the stockholders.

The allegations of the Complaint thus do not support a reasonable inference that the Committee acted in bad faith. Nor does the Complaint offer any other reason to infer that the members of the Committee were not disinterested or independent. The second element of the *M&F Worldwide* framework is met.

## C.     The Committee's Authority

The third requirement under *M&F Worldwide* is that "the Special Committee is empowered to freely select its own advisors and to say no definitively." 88 A.3d at 645. The plaintiffs do not contest this requirement. The Proxy Statement describes the resolutions that granted the Committee the power to hire its own legal and financial advisors, and the Committee exercised that authority by hiring King & Spalding, Morris

37

Nichols, and Houlihan Lokey. The Proxy Statement's description of the resolutions also makes clear that the Board committed not to proceed with a transaction without a favorable recommendation from the Committee. The third element of the *M&F Worldwide* framework is met.

## D.     The Duty Of Care

The fourth requirement under *M&F Worldwide* is that "[t]he Special Committee meets its duty of care in negotiating a fair price." 88 A.3d at 645. The standard of conduct for the duty of care requires that directors "inform themselves, prior to making a business decision, of all material information reasonably available to them." *Aronson*, 473 A.2d at 812. For purposes of applying the *M&F Worldwide* framework on a motion to dismiss, the standard of review for measuring compliance with the duty of care is whether the complaint has alleged facts supporting a reasonably conceivable inference that the directors were grossly negligent.

The special committee in *MFW* met a total of eight times. It interviewed multiple financial advisors before selecting a firm. It obtained up-to-date projections from company management, then had its financial advisor prepare detailed financial analyses. The committee did not seek third-party offers, but it had its financial advisor assess the possibilities. The committee negotiated with the controller and achieved an increase in the price from $24 per share to $25 per share. 67 A.3d at 515. The court observed that in attacking the committee's process,

> the plaintiffs make a number of arguments in which they question the
> business judgment of the special committee, in terms of issues such as
> whether the special committee could have extracted another higher bid

38

from MacAndrews & Forbes if it had said no to the $25 per share offer, and whether the special committee was too conservative in valuing MFW's future prospects. These are the sorts of questions that can be asked about any business negotiation, and that are, of course, the core of an appraisal proceeding and relevant when a court has to make a determination itself about the financial fairness of a merger transaction under the entire fairness standard.

*Id.* at 516. The court rejected these arguments as bases for questioning whether the directors complied with their duty of care, holding that "[t]he record is clear that the special committee met frequently and was presented with a rich body of financial information relevant to whether and at what price a going private transaction was advisable." *Id.*

The Committee in this case met thirty-three times, negotiated with the Anderson Family for over five months, sought alternative buyers for the whole company, considered alternative transaction structures, rejected the Anderson Family's initial offer, submitted two counteroffers, negotiated over non-economic terms, and obtained a sale price 20% higher than the Anderson Family's initial offer. The resulting sale price was more than 90% above BAM's closing price on the day before the Anderson Family announced its bid. These facts do not support a reasonable inference that the Committee was grossly negligent.

Once again, the plaintiffs focus on Party Y's offer as the linchpin of their argument, suggesting that that the Committee was grossly negligent in accepting the Anderson Family's offer when a higher offer was available. For reasons that this decision already has discussed, the Committee could not force the Anderson Family to accept Party Y's offer, nor was it in a position to take action against the Anderson Family to

facilitate Party Y's offer. Given those constraints, some might say that exploring potential third-party actions was a vain act. In my view, however, the Committee's decision to do so definitively undercuts any possible inference of gross negligence. Rather than only negotiating with the Anderson Family or relying exclusively on the advice from Houlihan Lokey, the Committee sought additional information in the form of third-party expressions of interest. "A decent respect for reality forces one to admit that [a financial advisor's opinion] is frequently a pale substitute for the dependable information that a canvas of the relevant market can provide." *In re Amsted Indus. Inc. Litig.*, 1988 WL 92736, at *7 (Del. Ch. Aug. 24, 1988) (Allen, C.), *aff'd sub nom. Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279 (Del. 1989).

A committee can satisfy its duty of care by negotiating diligently with the assistance of advisors. *See MFW*, 67 A.3d at 514–16. A committee goes one better when it takes the additional step of gathering additional information through a market canvass. Doing so in this case allowed the Committee to test the Anderson Family's conviction about not being a seller. Having the offer in hand also helped the Committee negotiate, because the offer would be a data point in any post-closing appraisal action, giving the Anderson Family a reason to bump their offer to decrease the risk that dissenting stockholders would seek appraisal.

As in *MFW*, the plaintiffs advance other arguments. They erroneously contend that because BAM owned approximately $20 million in equity in its properties, the Anderson Family only paid $600,000 for the rest of the business. That is incorrect. The Anderson Family owned 57.6% of the Company, and the $21 million Merger value was only for the

shares that the Anderson Family did not already own. The plaintiffs also argue about inputs in Houlihan Lokey's valuation analysis. Neither supports an inference of gross negligence.

### E.     The Information Provided To The Minority Stockholders

The fifth requirement of *M&F Worldwide* is that "the vote of the minority is informed." 88 A.3d at 645. The plaintiffs have never asserted any disclosure claims.

### F.     The Absence Of Any Coercion

The sixth and final requirement of *M&F Worldwide* is that "there is no coercion of the minority." 88 A.3d at 645. The plaintiffs do not argue that there was.

### G.     The Operation Of The Business Judgment Rule

Once the elements of *M&F Worldwide* are met, the business judgment rule provides the operative standard of review. "Under that rule, the court is precluded from inquiring into the substantive fairness of the merger, and must dismiss the challenge to the merger unless the merger's terms were so disparate that no rational person acting in good faith could have thought the merger was fair to the minority." *MFW*, 67 A.3d 496 at 500. "[It is] logically difficult to conceptualize how a plaintiff can ultimately prove a waste or gift claim in the face of a decision by fully informed, uncoerced, independent stockholders to ratify the transaction." *Huizenga*, 751 A.2d at 901. By definition, at that point, rational people who were members of the minority thought the merger was fair.

In *M&F Worldwide*, Chief Justice Strine, then Chancellor, held that the evidence presented failed to "raise a triable issue of fact under the business judgment rule" where "[t]he merger was effected at a 47% premium[,] . . . [a] financial advisor for the special

41

committee found that the price was fair in light of various analyses," and "[a]fter disclosure of the material facts, 65% of the minority stockholders decided for themselves that the price was favorable." *MFW*, 67 A.3d at 519. In this case, the Merger provided the minority stockholders with a 90% premium, Houlihan Lokey opined that it was fair, and after disclosure of the material facts, 66.3% of the minority stockholders approved it.

It is not possible to infer that no rational person acting in good faith could have thought the Merger was fair to the minority. The only possible inference is that many rational people, including the members of the Committee and numerous minority stockholders, thought the Merger was fair to the minority.

## III.     CONCLUSION

The Merger satisfied the *M&F Worldwide* framework. The Complaint is dismissed with prejudice.